# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

LAVON ODEN,

                    Petitioner,            :    Case No. 1:18-cv-420

      - vs -                             District Judge Susan J. Dlott
                                         Magistrate Judge Michael R. Merz

Warden,
 North Central Correctional Complex,

                                  :
                    Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case, brought *pro se* by Petitioner Lavon Oden under 28 U.S.C. § 2254, is before the Court for decision on the merits on the Petition (ECF No. 1), the State Court Record (ECF No. 4), the Warden's Return of Writ (ECF No. 5), and Petitioner's Reply (ECF No. 7). The Magistrate Judge reference in this case has been transferred to the undersigned to help balance the Magistrate Judge workload in this District (ECF No. 8).

**Litigation History**

Oden was indicted by a Hamilton County grand jury on charges of aggravated murder, murder, aggravated robbery, and having weapons while under a disability. A jury found him guilty of all charges except the aggravated murder count and the trial judge imposed a combined sentence of sixty-three years to life.

2254(3) and Oden appealed with new counsel raising six assignments of error which the Ohio First District Court of Appeals overruled. *State v. Oden,* 2016 Ohio App. LEXIS 3817 (1st Dist. Sept. 23, 2016), appellate jurisdiction declined, 148 Ohio St. 3d 1428. Oden filed *pro se* an Application for Reopening under Ohio R. App.26(B), proposing four assignments of error whose omission he claimed demonstrated ineffective assistance of appellate counsel. The First District denied the Application on the merits. Oden took no appeal to the Supreme Court of Ohio, but later sought to supplement his App. R. 26(B) Application. The First District denied that request and Oden again did not appeal.

Oden filed his Petition by placing it in the prison mail on June 7, 2018 (ECF No. 1, PageID 26). He pleads the following grounds for relief:

> **Ground One**: The Trial Court erred as a matter of law by allowing hearsay evidence to be admitted in violation of Appellant's right to a fair and impartial trial.
>
> **Supporting Facts[1]:** The Sixth Amendment's Confrontation Clause provides a criminal defendant: the right to directly confront adverse witnesses; the right to cross- examine adverse witnesses; and the right to be present at any stage of the trial that would enable the defendant to effectively cross-examine adverse witnesses.
>
> The Confrontation Clause of the Sixth Amendment may prohibit the admission of hearsay evidence against a criminal defendant when the defendant lacks the opportunity to cross-examine the out-of-court declarant. However, the admission of out-of-court statements does not violate the Confrontation Clause if the declarant testifies at trial and is subject to cross-examination.
>
> In this case the declarant, Darryl Craig, (Craig herein), did not testify at trial.

---

[1] Oden's Petition completely ignores the instructions in the standard habeas form not to argue or cite cases in the Supporting Facts. The Court's copying of Petitioner's actual words here should not be read as an endorsement of this way of proceeding. By including allegations of fact in these statements of supporting fact, Petitioner had not provided evidence. The evidence a habeas court can consider is strictly limited by 28 U.S.C. 2254(e) and *Cullen v. Pinholster*, 563 U.S. 170 (2011).

In the First District Court of Appeals, Opinion and Journal Entry, the court determined that much of the evidence, including: "Craig's out-of-court identification of Oden as the shooter[;] and the contents of Craig's text messages[;]" was in fact "inadmissible hearsay." Further, the court determined, "[they could] not say,[ ... ] that the results of the trial would have been different absent its admission, and that a reversal is necessary to avoid manifest injustice."

Usually text messages are considered non-testimonial and are therefore not excluded as hearsay. In this case, the text messages were used to describe events that occurred immediately before the marijuana sale. Further, the text messages were certainly offer [sic] for their truth because they discussed: the alleged robbery; shooting; and who was present. The State requested Robert Johnson to identify the text messages between him and Darryl Craig, these texts are found in Mr. Craig's cell phone records that were presented as *State's Exhibit* 30. Darryl Craig texts often, and does not stop until he arrives at the car; this car is the very car in which the robbery and subsequent murder took place. The texts read like a journal providing all of the details about the drug transaction that is about to take place. Upon review of the text messages it is clear they are testimonial in nature; because they provide Craig's personal perspective of how the events unfolded prior to the drug deal, robbery, and murder. *See (Tr.* Pg. 1280-1283).

A violation of the Confrontation Clause is subject to harmless error analysis[.] Harmless error exists if it is established beyond a reasonable doubt that the violation did not contribute to the verdict. This court has previously determined, "habeas court should grant petition if it has 'grave doubt' about whether trial error had substantial and injurious effect or influence upon the jury's verdict." It is clear the inadmissible hearsay loaned substantial weight to the case that would not otherwise have existed. It is also clear this bolstered evidence influenced the jury; guiding them toward a guilty verdict, by providing an additional witness to the crime. This witness could not be discredited through cross examination. The trial court claims there was "significant admissible evidence of guilt" but does not address how this evidence was weighed in drawing their opinion.

If we were to ignore the hearsay evidence, the remaining evidence would be limited to: (I) the testimony of Curtis Boston; (2) the identification by Robert Johnson; (3) the possible location of the defendant based on cellular data; and (4) the text message by the Appellant allegedly selling a "Ruger."

While uncorroborated accomplice testimony alone can support a conviction, *United States v. King,* 288 F. App'x 253, 256 (6th Cir.

2008), the Sixth Circuit warns that this type of testimony should be given more caution than other testimony when weighing its credibility. See *6th Cir. Pattern Jury Instruction* 7 .08.

First, from the record it is clear that Boston is not the most reliable witness. Boston is a self admitted accomplice to the crime. Boston testified he was incarcerated for this murder charge as well as a separate aggravated robbery from December of 2012 which did not involve the petitioner. (Tp. Pgs. 749, 750, 751, 834). Boston sent a text message to a friend that said he "fucked up" and needed a place to go, this suggests guilt. In another text message to a friend. Boston said, "Bra, if l get locked up say Whiteshit [referring to the Petitioner,] told you that he robbed them [and] shot." (Tp. Pgs. 802, 818, 819). Boston testified, he did not want to talk to the police but, after he was arrested and talked to his father, he told the police what happened. He admitted he did not agree to testify until he was offered a 12 year deal.  (Tp. Pgs. 824,829, 831, 836); Boston demonstrated he had motive to implicate the Petitioner, in this crime, when he testified about, The Petitioner and Boston's brother being arrested in 2011; in which, his brother pled guilty, but Petitioner beat the case. (Tp. Pg. 842); There was also testimony from Det. Karaguleff that several **Crime Stoppers** tips came in identifying Boston as the shooter (Tp. Pgs. I 026, I 029-1031 ); See *also Trial Del Ex.* #3. Further, these tips indicated Boston had bragged about the incident on Facebook. (Tp. Pg. 1032, 1034); *Trial Del Ex.* #3. These tips could lead one to believe Boston was in fact the shooter. Boston admitted to speaking to Darryl Craig, while in lock up about the case which helped him remember some facts. (Tp. Pgs. 846-847). When trial counsel made an attempt to delve into the conversation between Boston and Craig in order to discern what was discussed; the prosecution objected and the court sustained the objection. (Tp. Pgs. 847). The questions by trial counselor, James Bogens, were reasonable due to Boston's testimony; so the court sustaining the objection was clearly an abuse of judicial discretion.

Second, Robert Johnson's identification was impermissibly suggestive; and he was an unreliable witness as demonstrated below. *See also Ground 5.*

Upon review of Mr. Johnson's testimony and pre-trial statements; this court will find he was an unreliable witness.  Mr. Johnson testified he set up a purchase of marijuana with Boston on January 30, 2013. (Tp. pgs. 329-330); *See also States Ex.* #17. Mr. Johnson testified that on January 301h, he was driving with Da'Shawn Wheeler, in the front passenger seat, and Darryl Craig behind him. He picked up Boston and drove to Burton Avenue. Mr. Johnson

4

testified, Boston got out of the car and went into an apartment building. It was dark at the time. Mr. Johnson testified, he was getting very nervous since Boston was gone a long time. (Tp. pgs. 343, 346, 347, 348, 350, 352, 356, 357). The buyer asked to see the marijuana and opened the car door. Mr. Craig showed him the marijuana, and then the buyer pulled out a big, black gun while Boston stood back. Mr. Johnson admitted he told the police, on the night of the incident, that the gun was a silver .40 caliber Glock. (Tp. 359,363,365, 370; Tp. 370,406). Mr. Johnson testified, "They said, 'You know what time it is, give me everything." Mr. Johnson testified he then took off, and as he did, the buyer fired one shot through the back window. (Tp. Pgs. 367-368,372). Mr. Johnson admitted he could not tell the build of the shooter, he admitted he could not tell if the shooter had facial hair or what hand the shooter was holding the gun with. (Tp. pgs. 407, 408,411). Mr. Johnson identified Appellant as the shooter, six days after the incident, but when he spoke to the police on the night of the incident he could not identify the shooter. Mr. Johnson admitted he lied to the police about the marijuana deal. He also admitted he lied when he said the shooter took them by surprise. He admitted he did not mention that Boston was present during either interview. (Tp. 378, 387, 389, 406, 409, 410). Mr. Johnson testified he selected Appellants photo from lineup, and that he was 90% sure it was him. {Tp. Pgs. 390, 393, 396). Detective K.araguleff testified Mr. Johnson told him the shooter was 5'6" or ST' tall, dark skinned black male with a scar on his nose. (Tp. Pgs. 949, I 037). This Petitioner does not have a scar on his nose.

Most of the factors that Dr. Berry testified to, about problems with identification, happened here. Mr. Johnson did not know the shooter, it happened quickly, and there was a weapon involved which put Mr. Johnson in an extreme stress situation. This is in addition to the fact Mr. Johnson was in the front seat so his ability to see the shooter clearly is doubtful. Mr. Johnson could not have seen who fired the shot either because the shot was fired after he drove off. Mr. Johnson admitted to detectives on that night he could not identify the shooter, but six days later he could. This is a concern since Dr. Berry testified memory can decay after a period of time, and six days is not an ideal length of time. Further, on January 30th Mr. Johnson told detectives the gun involved was a silver .40 caliber Glock, yet, trial, it was a big, black gun. As Dr. Berry testified, memory can still change, even assuming it was properly coded at the time. Another significant concern was the fact Mr. Johnson never mentioned Boston's involvement to the police during either of his police interviews.

Third, Agent Moledor opined, the Petitioner was in the vicinity of the shooting, based upon historic cell phone data, the fact is the Petitioner could have been anywhere within a 21 mile radius according to the expert testimony from Mr. Schenk. This is also assuming the signal went to the **closest tower.** (Emphasis added). This is a big assumption, considering all the factors that could interfere and cause the signal to go elsewhere. Both witnesses agreed the only way to pinpoint a person's location from cellular data is through triangulation; this technique though was not used. Even assuming Agent Moledor was correct and the Petitioner was in the vicinity, this can be easily explained from testimony that the Petitioner's girlfriend lived in the apartment complex near the shooting. This could explain why his phone was in the vicinity. Further, if the court examined the Petitioner's cellular data; they would find the Petitioner often spends time in the vicinity of this cellular tower.

Fourth, Robert Lenhoff, a firearms examiner, testified the bullet recovered was consistent with 9 mm Luger ammunition; which could have been shot from 30-35 different brands of firearms. Mr. Lenhoff testified there were no guns submitted for comparison. (Tp. Pgs. 904,919,920,921).

Detective Karaguleff testified the car door handle was swabbed for DNA, a mixture of DNA from three unknown suspects was found and the Petitioner was excluded from being a contributor. (Tp. Pg. IO 17). This supports the Petitioner's claim that he was not involved. If, as testified by Johnson: the shooter opened the door; and the Petitioner is the shooter; then the Petitioner's DNA should have been a contributor.

We disagree with the trial courts assessment that the remaining evidence was sufficient to support conviction, especially if this court were to consider this issue with the other *plain errors* for *cumulative error.* The *cumulative error* value clearly demonstrates a necessity for relief.

**Ground Two**: The trial court erred as a matter of law by overruling appellant's motion for a mistrial.

Supporting Facts: Pursuant to the manifest necessity doctrine, a mistrial should not be declared unless there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. The *Perez* approach abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a

criminal trial. Instead, *Perez* prescribes a case-by-case approach, taking into account all the facts and circumstances to determine whether there was a manifest (i.e., a high degree of) necessity for the mistrial declaration.

Although trial courts should be accorded deference in making a determination of manifest necessity, they must employ sound discretion and must consider the defendant's right to end his confrontation with the state through a verdict from the particular tribunal he faces. Sound discretion exists where the trial judge acts responsibly and deliberately rather than irrationally or irresponsibly.

Absent a showing of prejudice, the *plain error* rule does not require reversal of a conviction where a witness may have violated a separation order.

In this case, Petitioner made a motion for mistrial after hearing testimony from Boston that he spoke to the witness Darryl Craig, while in lock up. Boston testified Craig helped him remember some facts about the case. *See* (Tr. Pg. 846-847.) The only fact we know Craig helped Boston remember was regarding the theft of the earring. (Tr. Pg. 845 - 846.) The trial court had earlier established a separation order between Boston and Craig; that extended to their being separated in the county jail. Boston admitted his testimony was influenced by his conversations with Craig.

It is unclear how Boston's testimony was influenced, because when the Petitioner's trial counsel attempted to question Boston about what was discussed, the prosecution objected and the trial court sustained the objection. When the trial court sustained the objection, it was an abuse of judicial discretion because; Boston's own testimony demonstrated the line of questioning was necessary to determine how Craig influenced his testimony. *See* (Tr. Pg. 846-848). It is possible and likely that parts of Boston's testimony were not from his personal account of the events; but instead are a direct result of his collaboration with Craig. This is a very troubling situation because it is difficult to determine what may or may not have been influenced expo [sic] facto.

Further, when the trial court sustained the prosecutions objection preventing trial counsel's inquiry into this issue; trial counsel was denied adversarial testing to determine if and how Craig influenced Boston's testimony. This invokes the third prong of the *Cronic* standard; which "occurs when counsel is placed in circumstances in which competent counsel very likely could not render assistance," *United States* v. *Cronic,* 466 U.S. 648, at 659 (May 14th 1984). The

court removed counsel's ability to demonstrate any possible prejudice to the Petitioner when they prevented the necessary questioning to determine if any prejudicial influence occurred to Boston's testimony. Since, counsel was prevented from performing the necessary "adversarial testing" to determine the possible prejudice, prejudice must be presumed pursuant to *Cronic.*

Further, the court may attempt to argue that any prejudice was removed because Craig did not testify. This is not true because Craig's testimony was improperly introduced as hearsay and further this would not remove Craig's influence upon Boston's testimony. Boston's testimony may have been in part Craig's testimony due to their admitted collaboration.

Since, the Petitioner's convictions were based solely on the testimony of these witnesses; the violation of the separation order was so significant that a fair trial was no longer possible. The trial court therefore abused its discretion by: overruling the motion; and preventing counsel's inquiry into Craig and Boston's conversation.

This issue constitutes a *plain error* and is subject to *cumulative error* review.

**Ground Three**: Appellant was denied effective assistance of counsel in violation of his constitutional rights thus prejudicing his right to a fair trial.

**Supporting Facts:** To establish **ineffective assistance of counsel,** a habeas petitioner must show that his counsel provided deficient performance and such deficient performance prejudiced his defense so as to render the trial unfair and the result unreliable. Under AEDPA, a state court's ruling on **ineffective assistance of counsel** claims will only be disturbed if it is an unreasonable application of Strickland. Focusing on the performance component, the U.S. Supreme Court explained when a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. A reviewing court's scrutiny of counsel's performance is highly deferential; indeed, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The reviewing court must also not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors.

To satisfy the prejudice prong of the Strickland test, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A habeas petitioner is not entitled to a presumption of prejudice unless it can be said that his counsel failed meaningfully to oppose the prosecution's case. Where one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different, there is an insufficient showing of prejudice.

## (1) Counsel was Ineffective for Failing to Object to Hearsay Statements

In this case, Petitioner argues his trial counsel was ineffective for failing to object to the hearsay statements as set forth in **Ground One,** thus limiting this Court's ability to review that *plain error.* Petitioner reminds the court to take in consideration the admitted inadmissible evidence, from the appellate court['[]s decision, thus citing: Craig's out-of-court identification of Oden as the shooter; and the contents of Craig's text messages. The appellate court determined this evidence is inadmissible in their opinion and journal entry. *See State v. Oden.* 2016 Ohio Apo. LEXIS 3817 (Although much of this evidence was inadmissible hearsay, we cannot say, in light of the significant, admissible evidence of guilt, that the results of the trial would have been different absent its admission, and that a reversal is necessary to avoid a manifest injustice.)

It is clear from the facts that counsel's failure to object to the evidence was unreasonable considering, the context of the circumstances at the time of the alleged errors. Counsel's failure to object allowed the state to introduce a third eyewitness, to the jury, that was never subject to cross examination.

"Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis* v. *Alaska.* 415 U.S. 308 (1974), because the petitioner bad been 'denied the right of effective cross-examination' which 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Id.,* at 318 (citing *Smith* v. *Illinois,* 390 U.S. 129, 131 (1968), and *Brookhart* v. *Janis.* 384 U.S. l, 3 (1966))." quoting *United States v. Cronic.* 466 U.S. 648, at 659 (May l4th 1984).

"Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id* at 660.

"The United States Court of Appeals for the Sixth Circuit recently explained that, pursuant to *United States v. Cronic.* 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984), and *Bell v. Cone, 535* U.S. 685, 152 L. Ed 2d 914, 122 S, Ct, 1843 (2002), three types of cases warrant *Cronic's* presumption-of-prejudice analysis rather than Strickland's two-prong test of a deficient performance and resulting prejudice. *Mitchell v. Mason.* 325 F.3d 732. 742 (6th Cir. 2003). The first type of circumstance that warrants a presumption-of-prejudice analysis is the complete denial of counsel at a critical stage of the proceedings; the second is when counsel fails to subject the prosecution's case to meaningful adversarial testing; and the third occurs when counsel is placed in circumstances in which competent counsel very likely could not render assistance. Id." *Meade v. Lavigne,* 265 F. Supp. 2d 849

In the case at hand, the Petitioner was denied the right to cross-examine Darryl Craig which caused a violation of the second and third prong of *Cronic.* resulting in a 'constitutional error' of the 'first magnitude' of which no amount of showing of want of prejudice could cure. Trial counsel was placed in circumstances in which competent counsel very likely could not render assistance, because he could not discredit Craig's testimony. The denial of cross-examination caused trial counsel to be unable to subject the prosecutions case to adversarial testing.

If prejudice is to be presumed in a situation denying the Petitioner to meaningful adversarial testing, as demonstrated above, then prejudice must be presumed in this case.

As described above, pursuant to *Strickland,* "[a] habeas petitioner is not entitled to a presumption of prejudice unless it can be said that his counsel failed meaningfully to oppose the prosecution's case." The AEDP A standard, *above,* ·demonstrates an incorporation of *Cronic* into the *Strickland* standard; If prejudice is to be presumed then the appellate courts application of the *Strickland* standard in requiring the outcome of the trial to be different was in error. The appellate court clearly did not review the case taking into consideration the *Cronic* exceptions. *See Strickland v. Washington,*

466 U.S. 668, 104 S.Ct. 2052. 80 L.Ed.2d 674 (Mav, 14th 1984) and *United States v. Cronic,* 466 U.S. 648, at 659 (May 14th 1984).

The appellate court already determined, "much of this [hearsay] evidence was inadmissible" this "include[ed] Craig's out-of-court identification of Oden as the shooter and the content of Craig's text messages." *State v. Oden,* 2016 Ohio App. LEXIS 3817 at if4. Therefore, the first prong requiring: the petitioner to show that the counsel's representation fell below a reasonable standard; has already been determined and this court can proceed directly to the "prejudice" prong.

The Supreme Court explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 698. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364,372, 122 L. Ed. 2d 180, 113 S. Ct. 838 (1993) (**189) (citing *Strickland.* 466 U.S. at 687); *see also Combs,* 205 F.3d at 278 (quoting same); *Tucker,* 181 F.3d at 754-55; *Chandler,* 813 F.2d at 781-82; *Jamison v. Collins,* 100 F. Supp. 2d 647 at 723-724.

Prejudice can be demonstrated under the *Strickland* standard because; the hearsay evidence that was introduced influenced the jury in drawing the conclusion of guilt. The identification by Darryl Craig, see State's Exhibit #11 from Trial, which bolstered Robert Johnson's identification and provided the prosecution with a key witness that could not be subjected to cross examination. In a similar manner Craig's text messages were unable to be subjected to adversarial testing because Darryl Craig did not testify. In addition, the opportunity for testing of Craig's testimony for credibility and reliability was completely removed. Therefore, trial counsel's ability to subject this testimony to adversarial testing was completely removed In conclusion. the lack of adversarial testing of the hearsay evidence by trial counsel rendered the trial proceedings fundamentally unfair. When trial proceedings are "fundamentally unfair" prejudice has been demonstrated pursuant to *Lockhart. Cronic and Strickland.*

Further, if this court were to determine this issue is a *harmless error* under *Strickland* or *Cronic,* this issue amounts to a *plain error* and is subject to a *cumulative error* review.

## (2) Counsel was Ineffective for Failing to Renew the Motion for a Mistrial

11

Pursuant to the manifest necessity doctrine, a mistrial should not be declared unless there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. The *Perez* approach abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial. Instead, *Perez* prescribes a case-by-case approach, taking into account all the facts and circumstances to determine whether there was a manifest (i.e., a high degree of) necessity for the mistrial declaration.

Although trial courts should be accorded deference in making a determination of manifest necessity, they must employ sound discretion and must consider the defendant's right to end his confrontation with the state through a verdict from the particular tribunal he faces. Sound discretion exists where the trial judge acts responsibly and deliberately rather than irrationally or irresponsibly.

Absent a showing of prejudice, the plain error rule does not require reversal of a conviction where a witness may have violated a separation order.

In this case, Petitioner made a motion for mistrial after hearing testimony from Boston that he spoke to the witness Darryl Craig, while in lock up. Boston testified Craig helped him remember some facts about the case. *See* (Tr. Pg. 846-847.) The only fact we know Craig helped Boston remember was regarding the theft of the earring. (Tr. Pg. 845 - 846.)  The trial court had earlier established a separation order between Boston and Craig that extended to their being separated in the jail. Boston admitted his testimony was influenced by his conversations with Craig.

It is unclear how Boston's testimony was influenced because when the Petitioner's trial counsel attempted to question Boston about what was discussed; the prosecution objected and the trial court sustained the objection. When the trial court sustained the objection it was an abuse of judicial discretion because, Boston's own testimony demonstrated the line of questioning was necessary to determine how Craig influenced his testimony. *See* (Tr. Pg. 846-848). It is possible and likely that parts of Boston testimony were not from his account, of the events, but instead are a direct result of bis collaboration with Craig. This is a very troubling situation because it is difficult to determine what may or may not have been influenced *expo[sic] facto.*

When the trial court sustained the prosecutions objection preventing trial counsel's inquiry into this issue, trial counsel was denied the right to subject Boston to adversarial testing in regards to Craig's influence on Boston's testimony. This establishes an instance of the third prong of the *Cronic* standard of review which "occurs when counsel is placed in circumstances in which competent counsel very likely **could not render assistance,"** *United States v. Cronic,* 466 U.S. 648, at 659 *(May* 14th 1984) (emphasis added). The trial court removed counsel's ability to demonstrate any possible prejudice to the Petitioner both at trial and in the appellate court. They did so, when they prevented the necessary questioning to determine if any prejudicial influence occurred to Boston's testimony. The appellate court addressed this in their opinion, "We overrule[ ... ] because the appellant demonstrated neither that Boston had discussed what had been testified to in court in violation of the order nor that a fair trial was not possible." *Oden* 2016 Ohio App. LEXIS 3817 at 4. Therefore, the appellate court did not come to their decision with consideration as to whether prejudice should be presumed. Trial counsel, as described above, was prevented from performing the necessary "adversarial testing" to demonstrate prejudice; therefore, prejudice should be presumed.

Further, the court may attempt to argue that any prejudice was removed because Craig did not testify. This is not true because Craig's testimony was improperly introduced as hearsay and further this would not remove Craig's influence upon Boston's testimony. Boston's testimony due to influence may have been in part Craig's testimony.

Since Petitioner's convictions were based solely on the testimony of these witnesses, the violation of the separation order was so significant that a fair trial was no longer possible. The trial court therefore abused its discretion by overruling the motion and preventing counsel's inquiry.

Had counsel renewed the motion for a mistrial at the conclusion of trial; the court may have conducted the necessary inquiries into this issue to determine the actual effect on the proceedings. This issue could have been better addressed by the court once all of the relevant facts were presented; therefore, counsel should have renewed the issue at the conclusion of proceedings.

This issue constitutes a *plain error* and should be reviewed for *cumulative error.*

**Ground Four**: Appellant was denied effective assistance of appellate counsel by failing to raise the issue that trial counsel knowingly during closing argument stated, that the defendant was guilty of a lesser charge, without the defendant's approval of this tactic, in violation of his constitutional rights thus prejudicing his right to a fair trial.

**Supporting Facts:** "The presentation of additional facts in the federal petition (or in a federal proceeding) does not evade the exhaustion requirement the prisoner has presented the substance of his claim to the state courts, and supplemental evidence does not fundamentally alter the legal claim they considered." *Vasguez v. Hillery, 414* U.S. 254, 257-58, 106 S. Ct. 6 I 7, 88 L. Ed. 2d 598 (1986). "Where the legal basis for [petitioner's] claim has remained constant, and where the facts developed in the district court merely substantiate it, we cannot say that the claim has been so 'fundamentally alter[ed]' from that presented to the state courts as to preclude our review." *Richey v. Bradshaw.* 498 F.3d 344, 353 *(6th* Cir. 2007).

Under *Strickland's* two-part test, the petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [ l] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. Unless the petitioner makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance.

This Court has held the position that a concession of guilt does not amount to ineffective assistance of counsel, per se. The Court stated. a complete concession of guilt is a serious strategic decision that must only be made after consulting with the client and after receiving the client's consent or acquiescence. This Court placed the

burden on the petitioner to show that he was not consulted and that he did not agree to or acquiesce in the concession strategy.

This Petitioner was not at any time consulted by his trial counsel about the use of this trial tactic. As stated in the Prosecutions response to this claim in the appellate court,[ ... ] "decisions about viable defenses are the exclusive domain of defense counsel after consulting with the defendant." It is clear questionable trial tactics must be discussed with the Petitioner before they are used. This Petitioner swears, he did not give trial counsel permission to use this tactic and further, this tactic was not discussed with the Petitioner. Therefore, trial counsel abused his discretion by using this tactic. Counsel's erroneous actions resulted in prejudice to the outcome of the proceedings.

There are two separate instances in which trial counsel conceded to the guilt of the Petitioner.

First, during the questioning of Boston trial counsel stated," [ ... ]I'm agreeing that Lavon was the shooter[ ... ][.]  (Tp. Pg. 845). This statement conceded that the Petitioner was the shooter thereby, conceding guilt to the crime of murder or aggravated murder. This statement, without: a jury instruction; or limitation to questioning; was inappropriate. In stating this, counsel misled the jury to believe counsel held the opinion that, "Lavon was the shooter."  Trial counsel's failure to phrase this statement clearly, as to context was obviously improper, amounting to ineffective assistance of counsel. Counsel's negligent actions directly influenced the jury to draw an assumption of guilt. This was highly prejudicial to the outcome of the case; by removing the Petitioner's ability to proclaim his innocence. Therefore, trial counsel actions prevented a fair trial from being possible and the counselor's statement fell below an objective standard of reasonable representation.

Second, during the closing arguments, which was the Petitioner's last opportunity to convince the jury of his innocents, instead of defending the Petitioner, trial counsel argued in favor of prosecution by stating, "[Boston]'s testimonials shows that whoever did the shooting it was not purposeful nor intentional." (Tp. Pgs. 1305-1306) Petitioner argues that by stating this to the jury, counsel gave the jury an alternative, that if they were to consider Petitioners guilt, it was not aggravated murder. Trial counsel was instructing the jury to find the defendant guilty of the lesser included offense of murder; rather than aggravated murder. Counsels' duty during closing is to attempt to prove the state has failed to prove the defendants guilt beyond a reasonable doubt. It is clear counsel misguided the jury by

presenting the defendant as the guilty party during his closing argument. The jury reacted to trial counsel's suggestion in finding the defendant guilty of the lesser included offense of murder. Counsel's incompetent statement during closing arguments, prejudiced the Petitioner's defense; by removing the plausibility of acquittal. This argument fell below an objective standard of reasonable representation because, counsel failed to get permission for the use of this harmful tactic.

This issue constitutes a *plain error* and should be reviewed for *cumulative error.*

**Ground Five**: Appellate counsel was constitutionally ineffective for failing to raise the issue that trial counsel failed to file a motion to suppress the identification prior to trial in violation of his constitutional rights thus prejudicing his right to a fair trial.

**Supporting Facts**:  The prosecution is going to claim that the petitioner did not present all of the supporting fact for this claim to the state court. This is true but, is not the fault of the petitioner. This petitioner had to make two separate requests to receive his discovery packet. The first request was made immediately after sentencing, on May 18th 2015, trial counsel did not disclose discovery. Later, the petitioner filed a writ of mandamus requesting an order to disclose the documents; this was dismissed by the court. Finally, the petitioner wrote trial counsel citing *O.R.P.C. rule* 1 .16(d) and threated to file a grievance with the Ohio Bar Association. This letter resulted in the discovery being mailed to the petitioner on April 17'1\ 2017. The Petitioner's application was filed on December 14th of 2016. It is clear the discovery and necessary facts to properly support this claim were unavailable at the time of filing. The Petitioner made an attempt to later amend his claim and give the appellate court a fair opportunity to review this claim.

"The presentation of additional facts in the federal petition (or in a federal proceeding) does not evade the exhaustion requirement the prisoner has presented the substance of his claim to the state courts, and supple mental evidence does not fundamentally alter the legal claim they considered." *Vasquez v. Hillery. 414* U.S. 254, 257-58, 106 S. Ct. 617, 88 L.Ed. 2d 598 (1986). "Where the legal basis for [petitioner's] claim has remained constant, and where the facts developed in the district court merely substantiate it, we cannot say that the claim has been so 'fundamentally alter[ed]' from that presented to the state courts as to preclude our review." *Richev v. Bradshaw,* 498 F.3d 344, 353 (61b Cir. 2007).

To establish ineffective assistance of counsel, a habeas petitioner must show that his counsel provided deficient performance and such deficient performance prejudiced his defense so as to render the trial unfair and the result unreliable. Under AEDPA, a state court's ruling on ineffective assistance of counsel claims will only be disturbed if it is an unreasonable application of Strickland. Focusing on the performance component, the U.S. Supreme Court explained when a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. A reviewing court's scrutiny of counsel's performance is highly deferential; indeed, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The reviewing court must also not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors.

To satisfy the prejudice prong of the Strickland test, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A habeas petitioner is not entitled to a presumption of prejudice unless it can be said that his counsel failed meaningfully to oppose the prosecution's case. Where one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different, there is an insufficient showing of prejudice.

In this case, petitioner argues trial counsel was ineffective for failing to file the motion to suppress the identification by Robert Johnson prior to trial. Further, appellate counsel was ineffective for failing to raise the issue on appeal. It is clear from the manifest weight claim presented on appeal; that appellate counsel recognized that there was a problem with Robert Johnson's identification. Appellate Counsel attacked Johnson's identification in the brief while she was addressing the manifest weight claim. This was a *moot* act because, the standard of review for this claim requires the evidence be viewed in the light most favorable to the prosecution. Had appellate counsel presented this claim as a separate *plain error;* then the court could have considered the *cumulative error value* of these claims; and had this been done, it is likely the outcome of the appeal would have been different.

A motion to suppress may be raised for the first time on appeal only if the admission of the identification evidence constituted *plain error* that affected substantial rights of the defendant.

This court uses a two-step analysis when considering whether a pretrial identification procedure raises a "very substantial likelihood of irreparable misidentification": first determining whether the identification procedure was impermissibly suggestive, and if it was, then looking to the totality of the circumstances to decide whether the identification was still reliable.

At the first step, the court considers whether the photo array [or photo line-up] included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect. In this case, the Petitioner claims the photo array [or photo line-up] was impermissibly suggestive because four of six photos did not resemble defendant. Similar to *Berry v. Berghuis,* 2011 U.S. Dist. LEXIS 50392. The police authorities were required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification. The police were not required to search for identical twins.

The second step is the totality-of-the-circumstances analysis, the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), enumerated the five factors for consideration: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention to the crime; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

Dr. Melissa Berry, a psychologist, testified and prepared a report regarding memory and eyewitness identification. (Tp. Pgs. 1065, 1068, 1069; *see also,* **Def. Ex. #6).**

In regards to the first *Biggers* factor, the opportunity of the witness to view the criminal at the time of the crime, Dr. Berry testified, that brief exposure is associated with less accuracy. In this case, the crime occurred at night and it was dark. Further, the crime occurred quickly. Mr. Johnson's position in the vehicle was also not optimum to witness the crime: Mr. Johnson was in the front drivers' seat; and allegedly the shooter was on the outside of the car, on the right back passenger side so his ability to see the shooter clearly is doubtful. Mr. Johnson could not have seen who fired the shot either because the shot was fired after he drove off.

In regards to the second *Biggers* factor, the witness' degree of attention to the crime, Dr. Berry testified: if a weapon is involved, people tend to focus on the weapon [versus] the face of the perpetrator; extreme stress, such as being in a life threatening situation, is detrimental to memory encoding and recall; memory can still change even if it is properly encoded; [and] memory decays over time. From Mr. Johnson's testimony of January 30th, 2013 stating, "I, Like, I was just thinking like, he might kill us all, if we, if we stayed there and I, and he was pointing the gun at everybody" we can see he felt his life was in danger. Therefore, we can conclude he was under "extreme stress" as described by Dr. Berry. Further, as Mr. Johnson stated the shooter, was "pointing the gun at everybody." Therefore, Johnson's focus was likely on the weapon as Dr. Berry described; this fact is supported by his own statement.

Further, in Johnson's statement on February 5, 2013 he stated," ... I don't remember seeing CJ" this clearly demonstrates that Johnson was not paying attention to the perpetrators as they approached the vehicle. Johnson claimed, "So, while me and Dashawn sitting there laughing, the, the, uh, the dude opened up the door[,]" dude is a reference to the shooter. Boston claimed at trial that he opened the door. (Tp. 843). Clearly these claims are contradictory. It is clear Johnson's degree of attention was questionable.

In regards to the third *Biggers* factor which assesses the accuracy of the witness' prior description of the defendant. Detective Karaguleff testified Mr. Johnson told him the shooter was 5'6" or 57' tall, dark skinned black male with a scar on his nose. (Tp. Pgs. 949, 1037). On January 301h Mr. Johnson had little to say in regard to describing the shooter. In his initial description he said, "I have no idea. He was a black guy. He had on a brown coat like a Carhartt." Later he described the shooters haircut as, "a regular haircut" and when questioned if it could be, "a fade or something" he conceded it could have. He guessed: the shooters' age to be "24 [or] 25[;]" and the shooters' height as "about *5'6",* 5'7." He could not give a description as to a physical build because "he had on a big coat."

When asked, "ls there anything that stood out about him to you, whether, it be voice, movement, face, something about his skin, his face, anything that make him stand out from, like if you look at a group of people, he stands out because of(?)" Johnson replied, "No, sir. No, sir." When questioned about facial hair he said, "I couldn't, I couldn't really tell." He claimed the shooter has "dark skin." He further stated, he had "never seen him before" referring to the shooter. When asked, "Do you believe that if you saw a picture of

him again you would recognize him?" Mr. Johnson responded, "Maybe. I don't."

When questioned about the gun Mr. Johnson described the weapon as a large, silver, semi automatic weapon possibly a "40 [caliber] Glock or something like that." At trial, Johnson changed his testimony and described the weapon as "a bid [sic] black gun." As Dr. Berry testified, memory can still change, even assuming it was properly coded at the time. When Johnson was asked, "Um. And you can't remember what hand he had [the gun in], right?" Johnson stated, "No; sir." and then claimed, "But, I think it was the right. I think."

In regards to the fourth *Biggers* factor which is the level of certainty demonstrated by the witness at the confrontation. Initially during the January 30th interview, when asked, "Do you believe if you saw a picture of [the shooter] again you would recognize him?" Johnson responded, "Maybe. I don't." Later at the February 5th interview Johnson said, "Some days I feel like I will know if I see a picture, but I don't, I don't know."

Sergeant Grant testified he was the blind administrator of the photo lineup shown to Robert Johnson. Grant testified he had shown Mr. Johnson the individual photographs, and he selected #4 saying he was 90% sure. Mr. Johnson did not look at photos #5 or #6. *See* (Tp. Pgs. 723, 724, 733-735; emphasis added).

In addition, there is reason to believe Johnson may have seen a photo of the Petitioner before the blind administration occurred and was therefore, poisoned. During the February 5th interview Johnson spontaneously says, "That's **him."** *See February 5th 2013 Interview* pg.15. The officer was not supposed to be showing Johnson the photo line-up when this occurred. It was unreasonable for the officer to have had a photo of the Petitioner in the interview room before the blind administration. The fact that Johnson "did not look at photos *#5* or *#6*" becomes significant because, it supports that Johnson's identification may have been poisoned. This is so because, he had seen a photo of the perpetrator before he made his identification to Sergeant Grant from the photo line-up. It is unclear from the evidence available to the Petitioner at this time, what photos from the line-up Johnson could see when he made his "spontaneous statement". Therefore, we are not sure if he was seeing one singular photo of the Petitioner or several photos. It is impossible, at this time, to truly know if the criminal at the time of the crime; (2) the witness' degree of attention to the crime; (3) the accuracy of the witness' prior and/or how the identification was poisoned. Did Johnson see a group of photos or was it only a single

photo of the Petitioner when he made his statement; this may only be answered by review of video footage of the interview, if at all. The facts heavily suggest the identification was poisoned before it was made; if this is true, the identification is completely invalid.

During Johnson's February 5th interview he mentioned rumors he had heard about possible suspects stating, "I heard Spud and they say he was short, muscular. I think that's the shooter. And I. But I also heard that his name starts with a 'D,'" and "And I heard that he was, he, was, um, he was on the, on the West Side, like toward English Woods. I don't, I don't know. But that, that's just what I'm hearing." This demonstrates that Johnson was unsure of who may have been involved other than CJ; it also shows that he believed that "Spud" may have been the shooter. Based on Johnson's statements before the identification it is highly unreasonable for him to claim a "90%" certainty after the confrontation.

Detective Karaguleff testified Mr. Johnson told him the shooter was 5'6" or 5'7" tall, dark skinned black male with a scar on his nose. (Tp. Pgs. 949, 1037). In fact, Johnson did not mention a scar on the shooter's nose. Johnson commented about his identification saying, "I think, I think it's his scars and his nose." *February 5th 2013 Interview* pg. 15. This strongly suggests the identification was made based solely on the Petitioner's nose and scars, as seen in the line-up. Detective Karaguleff's assumption that the scars were on the shooter's nose is incorrect. Johnson did not state where the scars resided on the shooter. His testimony implies that he recognized scars in the photo that he believed matched scars he, all of a sudden, could remember the shooter had. When asked if the shooter had anything that makes him stand out, Johnson never mentioned any scars. It should be noted: the Petitioner has no scars on his nose; and no scars that could be seen in a photograph.

In regards to the fifth *Biggers* factor which addresses the length of time between the crime and confrontation. Mr. Johnson admitted to the detectives on January 30th , the night of the incident, that he could not identify the shooter, but six days later he suddenly could. This is a concern since Dr. Berry testified memory can decay after a period of time, and six days is not an ideal length of time between the crime and confrontation.

Courts may consider the strength of other evidence against the defendant when making a reliability determination.

This issue constitutes a *plain error* and should be reviewed for *cumulative error.*

**Ground Six**: Appellant was denied effective assistance of appellate counsel for failing to raise the issue that prosecutorial misconduct rendered defendant-appellant's trial fundamentally unfair, in violation of the constitutional right to a fair trial.

**Supporting Facts**: "The presentation of additional facts in the federal petition (or in a federal proceeding) does not evade the exhaustion requirement the prisoner has presented the substance of his claim to the state courts, and supple mental [sic] evidence does not fundamentally alter the legal claim they considered." *Vasguez v. Hillery,* 474 U.S. 254, 257-58, 106 S.Ct. 617. 88 L. Ed. 2d 598 (1986). "Where the legal basis for [petitioner's] claim has remained constant, and where the facts developed in the district court merely substantiate it, we cannot say that the claim has been so 'fundamentally alter[ed]' from that presented to the state courts as to preclude our review." *Richey v. Bradshaw,* 498 F.3d 344. 353 (611, Cir. 2007).

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Factors to be considered in weighing the extent of a prosecutor's misconduct are: the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

A prosecutor may not argue or refer to facts not on the record. The prosecutor is, however, entitled to comment on the evidence and to draw reasonable inferences from it. "The prosecutor may not ask the jury to convict the defendant on the basis of the prosecutor's personal knowledge and the prestige of his office rather than on the evidence." It is not misconduct warranting reversal for a prosecuting attorney to express his individual belief in the guilt of an accused if such belief is based solely on evidence introduced and if jury is not led to believe there is other evidence which is known to prosecutor but which has not been introduced, justifying that belief. However, it is well established that the personal opinion of counsel has no place at trial. It is unprofessional for counsel to express a personal belief or opinion in the truth or falsity of any testimony. It is also unprofessional for counsel to make personal attacks on opposing

counsel. On the other hand, counsel must be given leeway to argue reasonable inferences from the evidence. Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying. Even if the prosecutor's comments were improper, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young, 410* U.S. at 11.

When reviewing claims of prosecutorial misconduct, a court must determine first whether the statements were improper. If they appear improper, then the court must look to see if they were flagrant and warrant reversal. To determine flagrancy, the standard set by the United States Court of Appeals for the Sixth Circuit is: (I) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally before the jury; and (4) the total strength of the evidence against the accused. A petitioner is not entitled to habeas relief unless the prosecutorial misconduct is so pronounced and persistent that it permeated the entire atmosphere of the trial, or so gross as to probably prejudice the defendant.

Improper vouching occurs when a jury could reasonably believe that a prosecutor was indicating a personal belief in a witness' credibility. Improper vouching also occurs when the prosecutor argues evidence not in the record, or when the prosecutor supports the credibility of a witness by expressing a personal belief in the truthfulness of a witness's testimony, thereby placing the prestige of the office of the prosecuting attorney behind that witness.

Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness. Improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury.

Mr. Tharp introduced false testimony by stating, "Historical cell data points to the defendant being contacted over and over with Boston's phone prior to the robbery clearly trying to convince the jury that this proves beyond a doubt the petitioner was involved which mislead and convinced the jury with false testimony.

During the opening arguments Prosecutor Ms. Trantor falsely claimed, "And a very important point, you're going to see texts from

the defendant 20 minutes after the shooting trying to get rid of a gun. Trying to get rid of a Ruger." (Tp. Pg. 287). Upon review of *State's Exhibit* 14A, this court will find the claimed time frame of "20 minutes" does not coincide with the record. The actual time frame is significantly greater than the prosecution led the jury to believe. The prosecutions misleading statement(s) gave this evidence substantially more weight than it merited, by creating a link between: the text; and the murder; that was unmerited.

During Mr. Tharps closing statement he said, "Robert Johnson, [Darryl] Craig, Curtis Boston, Da'Shawn Wheeler, Officer Brians, Sergeant Mcshane, Sergeant Howard, David Landesberg, Criminalist Steve Alexander, Criminalist Ed Deters, Detective Karaguleff; Gus, Paula Papke, Cincinnati Bell, Agent Bob Moledor from Columbus FBI, doctor Ed Ralston and Shannon Wheeler, Cunis Boston. I think that's sixteen witnesses. Sixteen witnesses all got up and told you the same story. Everyone got up and testified, and all of their pieces fit together. They are all corroborated and they point to the defendant being guilty." This statement is misleading in claiming that all "sixteen" witnesses told that same story. This statement would lead one to believe that all of these witnesses testified the same thing. This is not true their testimony only corroborates the eye witness testimony. The other witness testimony only contributes supporting interpretations of information and restated testimony of the eye witnesses. Further, the claim that Da'Shawn Wheeler testified is completely false, he could not testify as he was deceased. The introduction of his last word through Johnson does not amount to testifying because they can not be verified. The prosecution made this claim in an attempt to make it appear like the witnesses testimony should be treated with more weight than it merited and that there were more eye witnesses than existed. (Tp. Pg. 1251)

In the closing argument Mr. Tharp stated,"[ ... ] and we know from Lavon Oden himself that he was involved." (Tp. Pg. 1263) This statement is highly misleading; it leads one to believe that the Petitioner conceded his involvement in the crime. Upon review of the entire record this court would find that at no time did, "Lavon Oden", this Petitioner, admit or concede to his involvement in the crime. There was no concession: accidental; or otherwise; and no statement(s) by the Petitioner could reasonably be interpreted as such concession. Therefore, this statement was a blatant lie and could mislead the jury to believe the Petitioner was guilty of the crime by his own concession. The damage caused to the Petitioner's case by this statement is plain, apparent, and undeniable.

Later in closing Mr. Tharp states, "[The Petitioner] bas contact over and over, telephone calls prior to the robbery, to the murder - the robberies I should say to the murder and afterwards, and you heard that from Curtis Boston." (Tp. Pg. 1264). Upon review of the cell phone data: the Petitioner's *State's Exhibits* 11,13, 14, 14A(texts); and Boston's State's Exhibits, 16A, 16, 17; this court will find, that the Petitioner had no contact on the day of the crime prior to the robbery and murder with Curtis Boston as Tharp suggested. This is not to say the Petitioner did not speak with Boston on the phone in days prior to the crime. Mr. Tharp's testimony would lead one to believe that calls were made, between Boston and Oden, very near the time of the crime. This is not true and misleading. The statement by the prosecution was presented as the truth in the matter. This statement also misleads the jury to the conclusion that these alleged conversations were how the drug purchase was arranged. The statement established a false link between Oden and the crime. This provided additional evidence that Oden was involved, which the record does not, in fact, support.

During closing Mr. Tharp stated, "I would ask you to ask yourself, why didn't [Darryl Craig] testify? Well, ladies and gentlemen, if you leave the Ohio Department of Corrections and you come down and you leave he said, and you testify in a trial and you go back to the Ohio Department of Corrections, hey, guys, how are you all? Where did you go, [Darryl]? Well, I took a trip down to Cincinnati. I was testifying for the police in a trial, you guys want to play Backgammon? I would say it doesn't go over real well. He refused to testify." (Tp. Pg. 1279-1280). This above statement is a fabrication by the prosecution and has no place in trial proceedings.

This fabricated explanation of why Craig refused to testify provided a legally insufficient reason. This statement was an attempt to provide the jury with an excuse as to why the state *did not* present Craig after introducing his testimony. It was an attempt to distract from the fact that Craig's testimony was hearsay. It also led the jury to believe that Craig would be at risk of imminent harm had he testified. The record does not support this nor did the State provide evidence to support this claim. The statement is mere conjecture and had no place at trial.

In order for the prosecution to explain to the jury, why a witness is refusing to testify, the explanation must be a reasonable conclusion from: facts drawn from the record; or statements made by the witness. Further, the explanation must be legally sufficient to excuse the witness from testifying. Otherwise, the state is required to make

sufficient efforts to present the witness. In this case, the state did not make the appropriate effort to present the witness and the statement is an attempt to hide this fact from the jury.

Later, in the closing, Mr. Tharp states, "[Darryl] may not want to testify, we do know he's on community control, and [Darryl] is the kind of guy that has weed." (Tp. Pg. 1282). This statement is another suggested excuse as why Craig would not want to testify. The statement suggests: the prosecution assumed Craig did not want to testify; and thus, did not give Craig the option to testify. It is clear that the prosecution gained a significant advantage by introducing Craig's testimony and not having him testify because, it denied the defense adversarial testing. If the prosecution: introduced Craig's testimony; and intentionally withheld him from the defense; this suggests the denial of adversarial testing was a tactical strategy. Thus, the denial of confrontation was intentional. This issue is directly linked to the above hearsay claim. *See, generally, Ground One.* The prosecutions handling: of witness Darryl Craig; and his testimony caused the proceedings to be fundamentally unfair and denied the Petitioner due process.

In the closing argument, Mr. Tharp stated, "And the defendant says Curtis put him up to this." (Tp. Pg. 1287) This statement is highly misleading; it leads one to believe that the Petitioner conceded his involvement in the crime. Upon review of the entire record this court would find that at no time did, "the defendant", a.k.a. Petitioner, admit or concede to his involvement in the crime. There was no concession: accidental; or otherwise; and no statement(s) by the Petitioner could reasonably be interpreted as such concession. The Petitioner never made a statement to this effect. The alleged statement is a lie and misleads the jury to believe the Petitioner was guilty of the crime by his own concession. The damage caused to the Petitioner's case by this statement is plain, apparent, and undeniable.

Federal courts on habeas review of constitutional trial errors must determine whether the error had substantial and injurious effect or influence in determining the jury's verdict. Consequently, federal courts are to use and follow *Brecht* when reviewing habeas petitions of constitutional trial errors based on state court determinations of harmless error. Furthermore, the harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error.

To reverse a conviction, a claim of prosecutorial misconduct requires proof of improper conduct by the prosecutor that, taken in

the context as a whole, violated the defendant's due process rights. The above statements made by the prosecution were so detrimental to the Petitioner's guilt; the jury was lead to believe: damaging lies; and misstatements of fact; from the prosecution in an attempt to prove the petitioner's involvement and guilt in the crime. Further, trial counsel failed to object to these lies which rendered the petitioner's trial fundamentally unfair.

(Petition, ECF No. 1, PageID 5-22.)

# Analysis

**Ground One: Trial Court Error in Admitting Hearsay Evidence**

In his First Ground for Relief, Oden claims the trial court erred in admitting hearsay evidence. The Warden defends Ground One by pointing out that state evidence law claims are not cognizable in federal habeas. Respondent also argues lack of proper exhaustion, procedural default, and lack of merit (Return, ECF No. 5, PageID 1857).

Oden raised his inadmissible evidence claim on direct appeal as his second assignment of error. The First District Court of Appeals decided that claim as follows:

> In his second assignment of error, Oden argues that plain error occurred at trial when the trial court admitted hearsay evidence, including Craig's out-of-court identification of Oden as the shooter and the content of Craig's text messages. Although much of this evidence was inadmissible hearsay, we cannot say, in light of the significant, admissible evidence of guilt, that the results of the trial would have been different absent its admission, and that a reversal is necessary to avoid a manifest injustice. *See State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraphs two and three of the syllabus. Thus, we overrule the second assignment of error.

*Oden*, 2016-Ohio App. LEXIS 3817 at *4. In his Brief on Appeal, Oden admitted that no objection had been made to the admission of the hearsay evidence he complained of (Appellant's Brief, State

Court Record, ECF No. 4, PageID 126). Thus the First District reviewed this claim only for plain error.

Ohio has a procedural rule which requires contemporaneous objection to trial court error. The rule requires that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected. *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998). The Sixth Circuit has repeatedly held that this is an adequate an independent state court ground for decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied,* 562 U.S. 876 (2010).

Although the First District reviewed the evidence claims for plain error, the Sixth Circuit has held that plain error review is not a waiver of the contemporaneous objection rule, but an enforcement of it. Reservation of authority to review in exceptional circumstances for plain error is not sufficient to constitute application of federal law. *Cooey v. Coyle,* 289 F.3d 882, 897 (6th Cir. 2002); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000). An Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005);

*Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239 (6th Cir. 2001),

*citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute

a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003).

Oden likewise made no mention in his appeal brief of the Confrontation Clause which

forms part of his sub-claims under Ground One. Although he cited *State v. Hinkston*, 2015-Ohio-

3851 (1st Dist. Sept. 23, 2015), it was not for any Confrontation Clause issue, but as precedent for

the proposition that the content of text messages, if offered for the truth of the content, constitutes

hearsay under Ohio law. Thus no Confrontation Clause claim was fairly presented to the First

District on direct appeal.

Therefore Oden's First Ground for Relief should be dismissed as procedurally defaulted.

**Ground Two: Trial Court Error in Failing to Declare a Mistrial**

In his Second Ground for Relief, Oden claims the trial court committed error in denying a

mistrial over an asserted violation of the trial judge's separation of witnesses order. Oden raised

this issue as his third assignment of error on direct appeal and the First District decided it as

follows:

> We overrule the third assignment of error, which challenges the trial
> court's denial of a mistrial that was requested due to Boston's alleged
> violation of the separation order in the case, because the appellant
> demonstrated neither that Boston had discussed what had been
> testified to in court in violation of the order nor that a fair trial was
> not possible. *See* Evid.R. 615; *State v. Franklin*, 62 Ohio St.3d 118,
> 127, 580 N.E.2d 1 (1991).

*Oden*, 2016 Ohio App. LEXIS 3817 at *4.

When a state court decides on the merits a federal constitutional claim later presented to a

federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Because of the Double Jeopardy implications, the Constitution requires a mistrial only in cases of manifest necessity. The Supreme Court first enunciated the manifest necessity doctrine in *United States v. Perez,* 22 U.S. (9 Wheat.) 579 (1824)(Story, J.), where it said that a mistrial based on manifest necessity must be declared only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes. *See also Arizona v. Washington*, 434 U.S. 497 (1978).

The First District's decision is a reasonable application of the federal standard. It held first of all that it had not been clearly proved that a violation of the separation order occurred. That is, it had not been proven that Boston told Craig what testimony had been given in court. In any event Craig never testified so that none of his testimony was affected by what Boston told him.

Oden has not shown that the First District's decision on this claim is an objectively unreasonable application of the manifest necessity doctrine. Ground Two should therefore be dismissed on the merits.

**Ground Three: Ineffective Assistance of Trial Counsel**

In his Third Ground for Relief, Oden claims he suffered from ineffective assistance of trial counsel in various respects.

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* 560 U.S. 370, 389 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

> that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing Strickland, supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987), *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. 86, 111-12 (2011).

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) (per curiam); *Strickland*, 466 U.S., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. Id., at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." Id., at 693, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674. The likelihood of a different result must be substantial, not just conceivable. Id., at 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

*Harrington v. Richter*, 562 U.S. 86, 111-112 (2011).

Counsel's performance is measured by "prevailing professional norms" at the time of the alleged errors. *Strickland, supra,* at 690; *Maryland v. Kulbicki,* 577 U.S. ___, 136 S. Ct. 2, *; 193 L. Ed. 2d 1 (2015); *Rickman v. Bell,* 131 F.3d 1150, 1154 (6th Cir. 1997).

Oden raised ineffective assistance of trial counsel as his fourth assignment of error on direct appeal and the First District decided the claim as follows:

> In his fourth assignment of error, Oden argues that he was denied the effective assistance of counsel due to counsel's failure to object to the admission of hearsay evidence and to renew the motion for a mistrial at the conclusion of the trial. But the record fails to disclose a reasonable probability that, but for the alleged omissions of trial counsel, the results of Oden's trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

Oden, 2016 Ohio App. LEXIS 3817 at *4-5. Thus the First District cited the controlling Supreme Court precedent, *Strickland*, and the Ohio Supreme Court case, *Bradley*, recognizing *Strickland's* authority in Ohio.

The Magistrate Judge reads the First District's decision as a denial that Oden suffered any prejudice from trial counsel's failure to object or to move again for a mistrial, thus applying the second prong of the *Strickland* analysis without discussing the deficient performance prong. This application of *Strickland* is not objectively unreasonable as to the mistrial motion: because a mistrial was not manifestly necessary in any event, failure to renew the motion at the close of the evidence was not prejudicial.

As to the hearsay, counsels' failure to object constituted a procedural default under the contemporaneous objection rule which required the First District to review only for plain error. In his Brief on Appeal, Oden incorporated by reference in his fourth assignment of error the hearsay objections he had raised in the second assignment of error. In that assignment, he complained of

allowing admission of the content of Darryl Craig's text messages (Appellant's Brief, State Court Record, ECF No. 4, PageID 125-26). In addition, "Sergeant Grant was permitted to testify that Darryl Craig identified Appellant as the shooter." *Id.* at 126.

Although the state courts did not discuss the issue, Craig's out of court statements were probably admissible under Ohio R. Evid. 804(B)(3) as statements potentially subjecting Craig to criminal liability. Craig was clearly unavailable as he refused to testify. See Ohio R. Evid. 804(A)(2). Thus an objection by trial counsel to this hearsay would properly have been overruled. It is not deficient performance to fail to make an objection that would not have been upheld.

Oden's Third Ground for Relief should be dismissed because the First District's decision on ineffective assistance of trial counsel is not an objectively unreasonable application of *Strickland*.


**Grounds Four, Five, and Six: Ineffective Assistance of Appellate Counsel**


In his Fourth, Fifth, and Sixth Groun for Relief, Oden claims he received constitutionally ineffective assistance of appellate counsel when his appellate attorney did not complain of trial counsel's concession in closing argument that Oden was guilty of a lesser included offense when Oden did not approve of the concession, of trial counsels' failure to file a motion to suppress identification testimony, and of prosecutorial misconduct.

The Warden asserts Oden procedurally defaulted this claim by not appealing from the First District's denial of his App. R. 26(B) application to the Ohio Supreme Court. Failure to appeal would in fact constitute a procedural default barring habeas relief. *Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004).

Oden admits that he did not appeal, but asserts he has cause to excuse that failure because he was unaware of the final judgment rendered by the First District on his 26(B) application. He asserts this is because either the Clerk of Courts did not mail it to him or because the prison staff at North Central Correctional Complex failed to deliver the mail (Objection/Reply, ECF No. 7, PageID 1893-94). However, Oden offers no proof to support either of these hypotheses. Oden cannot rely on his own speculation to prove failure to these officials to get the opinion to him. Proof of facts to support a claim of cause to excuse procedural default would be admissible despite *Pinholster, supra*, but Oden has not offered any admissible evidence.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

November 29, 2019.

s/ *Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).